NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HENRY RUIZ,<br><br>        Plaintiff,<br><br>    v.<br><br>MORRIS COUNTY SHERIFF'S DEPARTMENT, FRANK CORRENTE, EDWARD ROCHFORD, RALPH McGRANE, and JONH DOES 1 through 10<br><br>        Defendants. | CIVIL ACTION NO. 05-1825 (DRD)<br><br>OPINION |

Appearances

PARAGANO & RICHLAN, P.C.
Vincent Paragano, Esq.
5 Seney Drive
Bernardsville, New Jersey 07924
    *Attorneys for Plaintiff*

JACOBS ROSENBERG, LLC
Roger B. Jacobs, Esq.
Gateway Four, 3rd Floor
100 Mulberry Street
Newark, New Jersey 07102
    *Attorneys for Defendant Frank Corrente*

LAUFER KNAPP, TORZEWSKI, & DALENA, LLC
James T. Prusinowski, Esq.
23 Cattano Avenue
At Chancery Square
Morristown, New Jersey 07960
    *Attorneys for Defendants Morris County Sheriff's Department and Sheriff Edward Rochford*

BARBULA LAW OFFICES
John M. Barbula, Esq.
Thomas Vittolo, Esq.

1242 Route 23 North
Butler, New Jersey 07405
    *Attorney for Defendant Ralph McGrane*

## *OPINION*

**DEBEVOISE, Senior District Judge**

    The Court's previous opinion of November 1, 2005 identifies the parties and explains the nature of the complaint in great detail.  Plaintiff, a correctional officer at the Morris County Correctional Facility ("MCCF" or "the Jail"), is an employee of the Morris County Sheriff's Department ("MCSD").  Defendants are MCSD, Morris County Sheriff Edward Rochford ("Rochford"), Chief Ralph McGrane ("McGrane"), MCCF Warden Frank Corrente, and John Does 1 through 10.  The Court dismissed portions of Plaintiff's complaint on November 1, 2005.  The remaining Counts of Plaintiff's complaint allege that defendants: (1) deprived Plaintiff of his constitutional right to free speech in violation of 42 U.S.C. § 1983 (First Count) and Article One paragraphs 6, 18, and 19 of the New Jersey Constitution (Fourth Count); and (2) violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et. seq.  Plaintiff alleges he was subjected to numerous acts of retaliation committed by Defendants.  Those acts of retaliation included: denial of promotion, unwarranted disciplining, job suspension, inequitable treatment, verbal taunts, assignment to undesirable work posts and shifts, removal from desirable work posts and shifts, and non-tendering of overtime assignments.  As explained in the November 1, 2005 opinion, the court will consider three acts alleged in the complaint as "protected speech" in support of the First and Fourth Counts.  Those acts are as follows: (1) Plaintiff alleges that he publicly opposed Defendant Rochford's attempts to privatize the jail by speaking publicly against

privatization at union meetings, freeholders meetings, and in the local newspapers; (2) Plaintiff alleges that the MCSD and the administration attempted to change staffing levels, and that he publicly opposed this plan at Freeholder meetings; and (3) Plaintiff alleges he publicly opposed efforts by defendants to remove protective vests from approved and compensated clothing worn by corrections officers.  Defendant Frank Corrente ("Corrente") has moved for partial summary judgement dismissing the portion of the First and Fourth Counts of the Complaint which relate to the privatization and protective vest issues.  Defendants MCSD, Rochford, and McGrane have joined in that motion.

### Uncontested Facts

Plaintiff has been employed as a corrections officer at the MCCF since August 9, 1988. (Corrente Cert. ¶ 9; Ruiz Aff ¶ 4.)  Plaintiff is the current union delegate for PBA Local 298, the official bargaining unit for the corrections officers at the jail.  (Corrente Cert. ¶ 10.)  He also served as the president of PBA local in 2000.  (Corrente Cert. ¶ 10.)  During the first five years that Plaintiff served as a State delegate for the PBA, he was permitted by superiors at the jail to go to the State PBA office to participate in union activities.  Plaintiff was granted unpaid leave to attend various Statewide PBA events.  As a result of this policy, Plaintiff was absent without pay for approximately 302 days from 1999 through 2004.  (Corrente Cert. ¶ 14.)  N.J.S.A. 11A:6-10 requires MCSD to grant up to seven days as a paid leave of absence for PBA representatives to attend yearly conventions.

Protective Vest Issue

In support of the First Count of the Complaint, Plaintiff claims he was subject to retaliation by defendants for speaking out on MCSD's decision to no longer provide protective vests to its corrections officers.  (Compl. p. 9.)  The warranty on the stab-resistant vests purchased by the administration for the MCSD corrections officers expired in November 2004. (Corrente Supp. Cert. Ex. E.)  On about, September 1, 2004, Union president Ronald Flammer and vice-president Robert Freid met with Defendants Corrente and McGrane to discuss the purchase of new protective vests for the staff at the jail.  (Corrente Supp. Cert. ¶19; Freid Aff. ¶¶ 3-5.)  At that meeting, it was decided that the administration would no longer provide protective vests for the corrections officers.   (Corrente Supp. Cert. ¶ 20.)  On September 2, 2004, Chief McGrane sent a memo to all sworn staff at the MCCF stating that "due to the nature of our inmate population, the lack of contraband weapons found during facility searches and the minimal amount of violence which has taken place in the facility over the last five years I have determined that stab resistant vests will not be replaced at this time.  However any sworn staff member who so desires may purchase their own stab resistant vest at their own expense." (Corrente Supp. Cert. Ex. E.)  A few days later, Officer Flammer had a second meeting with the administration in which he communicated that some of the union members were unhappy about that decision.  (Corrente Supp. Cert. ¶ 22.)  As a result, it was decided that Officer Flammer would take a survey of the sworn staff to determine how many individuals wanted to continue to wear protective vests.   (Corrente Supp. Cert. ¶ 22.)

On September 7, 2004, Officer Flammer sent out a memo to all union members stating that "the PBA would like to take a survey on how many sworn staff would actually prefer to wear the stab resistant vests on a daily basis compared to not wearing it at all...The majority of our

4

staff including myself would prefer not to wear the vest or face the possibility of getting reprimanded for not wearing it. " (Corrente Supp. Cert. Ex. F.)  On September 14, 2004, Plaintiff sent a memo to President Flammer stating that "I am writing this letter to ask for [sic] PBA support for the Department's issuance of stab resistant vests only to those individual officers who want to wear the vests.  Of course, if issued a vest it would become a requirement to wear it at all times." (Corrente Supp. Cert. Ex. G.)  Plaintiff stated that he could not be present at the union meeting regarding these issues, but asked that it be read to all of the union members.  (Corrente Supp. Cert. Ex. G.)  Plaintiff's memo somehow got into the hands of one of the Freeholders.  (Freid Aff. ¶ 7.)  On October 20, 2004, Warden Corrente sent another memo to all sworn staff stating that "...the agency will purchase a vest for those officers wishing to continue their use.  Staff are advised that if you request a vest you will be inspected daily for its use and those found not [to] be in compliance will be subject to disciplinary action." (Corrente Supp. Cert. Ex. H.)  Plaintiff and the vast majority of other officers declined to have the Administration purchase their vests because they did not want to be subject to daily inspections and disciplinary action for not wearing their vests.  (Corrente Supp. Cert. ¶ 27.)  Out of approximately one hundred-fifty five (155) sworn staff members, only nine (9) requested that the administration provide them with stab resistant vests.  (Corrente Supp. Cert. ¶ 27.)

On November 10, 2004, following a Freeholder meeting, Plaintiff and several other officers spoke with the County Freeholders and informed them that McGrane and Corrente had gone about a course of conduct with the corrections staff that was abusive and  violated the law. (Ruiz Supp. Aff. ¶ 23.)  On November 29, 2004, Plaintiff was charged with falsification of records, lateness, failing to report for roll call, and failing to submit late reports.  Plaintiff was

5

suspended for three days as a result. (Plaint's. App. Ex. C, D, E; Ruiz Supp. Aff. ¶ 26.) Plaintiff denies the allegations and claims he was unfairly punished because he spoke out on the protective vest issue. Plaintiff filed a grievance over these allegations on December 11, 2004. That grievance was denied by Defendant Corrente on December 16, 2004. (Plaint's. App. Ex. C, D, E.)

<u>Privatization Issue</u>

Discussions concerning the privatization of the MCCF took place in 1995. (Jacobs Supp. Cert. ¶ 3.) The last time this issue was raised at a Freeholder's meeting was in January 1995. (Jacobs Supp. Cert. ¶ 4.) During oral argument, counsel for Plaintiff stated that Plaintiff has been an outspoken critic of privatization. However, he acknowledged this issue has not been raised in a public forum since 1995.

## Contested Issues

The material contested issues center around the subjective motives Defendants had for suspending Plaintiff. Additionally, there remain the numerous instances of verbal abuse and taunting Plaintiff claims he suffered at the hands of Defendants due to his zealous representation of union members.

## *DISCUSSION*

I.   <u>Standard for Summary Judgement</u>

Summary Judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law,"

Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.   In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  Hunt v. Cromartie, 526 U.S. 541, 552 (1999), quoting, Anderson, 477 U.S. at 255.  But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the District court - that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986).

In the present case, Defendants have moved for summary judgement dismissing the portions of the First and Fourth Counts relating to the protective vest and privatization issues.  Defendants argue that the uncontested facts show that these issues do not relate to matters of public concern and therefore do not constitute protected speech, giving rise to a claim under the First Amendment and the New Jersey Constitution.  Defendants cite the limitations on the right to freedom of speech by public employees as a reason to the dismiss those claims.  While there exist disputed facts as noted above, the court must first determine whether, if inferred on the side of the Plaintiff, those facts would give rise to a violation of Plaintiff's First Amendment free speech right.

As stated in the opinion of November 2, 2005, "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir.2001). "While the government's role as employer ... gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large, this hand cannot act with impunity." Id. Therefore, "public employers cannot silence their employees simply because they disapprove of the content of such speech." Id. Courts employ a three step analysis when balancing the First Amendment rights of public employees against competing interests of their employers: (1) plaintiff must establish that the activity in question was protected (if it is purely personal in nature then it is not, if it is a matter of public concern then it is); (2), if the speech in question is protected, plaintiff must demonstrate that his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees; and (3) if a public employee's speech concerns a matter of public concern, and the balance of harm weighs in favor of the employee's expression, "plaintiff must then show that the protected activity was a substantial or motivating factor in the alleged retaliatory action." Id. at 195. Defendants now argue that Plaintiff's activity was not protected and fails to meet step one of this analysis.

In Brennan v. Norton, et.al., 350 F.3d 399 (2003), the Court of Appeals for the Third Circuit reviewed this Court's dismissal of several claims filed under § 1983 by a Teaneck Firefighter who claimed he was subject to acts of retaliation by the Township Manager and several officials of the Fire Department for speaking out on certain fire department issues. Brennan claimed among other things that he: (1) publicly opposed the Township's decision to close two of the four fire stations in the Township, (2) informed Township residents that the fire

sprinklers at the police station violated the fire code, (3) publicly challenged the Township Manager's proposal to replace the sub-code official with a non-fireman, (4) filed a formal complaint regarding the reluctance of the Township to requisition proper uniforms and pants for the firemen, and (5) informed the New Jersey Department of Labor and Health about the presence of asbestos in the Township's fire stations. Id. at 414. As a result of his actions, Brennan claimed that he was subjected to retaliation in the form of: harassment, intimidation, being given improper assignments, denial of holiday leave, being given menial/ labor intensive assignments for raising safety issues, involuntary transfer, suspension for reasons other officers would not be suspended, denial of overtime pay, false accusations, and denial of seniority status. Id. at 409-410. This Court had held that issues (1) through (3) were of public concern, but that (4) and (5) were not. In performing a detailed analysis of First Amendment claims by public servants, the Court of Appeals held that there was no public concern in (4) because the complaint alleged the uniforms were not delivered "quick enough," not that they were unsafe or not provided by defendants. Id. at 416. The Court of Appeals also found that (5) was a matter of public concern because the public has an interest in whether or not its public safety laws are being violated. Id. at 415. As previously stated, the instant case raises issues similar or identical to those which the Court of Appeals addressed in Brennan.

      Defendants filed an earlier motion for dismissal for failure to state a claim upon which relief can be granted. In ruling that the Plaintiff's statements concerning protective vests stated a valid claim, the Court held that publicly opposing efforts by defendants to remove protective vests from approved and compensated clothing worn by corrections officers was a matter of safety which should be of concern to the public. However, upon reviewing the uncontested facts

9

surrounding this topic, it is clear that this was an internal matter and not an issue involving public debate. While Plaintiff alleges that he publicly opposed efforts by defendants to no longer provide protective vests, the various affidavits submitted in support of the present motion, including Plaintiff's own affidavits, show that Defendants did indeed provide the protective vests to the corrections officers at the jail. The only debate surrounding the vests appears to relate to how the jail administration disciplined its officers who chose not to utilize their prescribed gear. The administration resolved this debate quite simply. It gave officers the choice to either (1) not use a department provided vest (and personally buy one for their own use should they so desire), or (2) use a department provided vest (and be subject to daily inspections and possible discipline if they did not use the vest purchased by the department). Whether or not the department chooses to admonish its officers for not using prescribed gear is purely internal and not an issue of public concern. Plaintiff's disagreement with the administration's policy is an internal issue.

     Speech addresses a matter of public concern when it can be reasonably related to "any matter of political, social or other concern to the community," Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir.1995), and it "attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." Connick v. Meyers, 461 U.S. 138, 148 (1983); see also Feldman v. Philadelphia Housing Auth., 43 F.3d 823, 829 (3d Cir.1994) (employee's auditing reports intended to highlight improprieties, disclose corruption, fraud, and illegality in a government agency was speech pertaining to matters of important public concern). This means that public speech cannot "constitute[ ] merely personal grievances." *Id.* In Brennan, the Court held that because plaintiff did not address any safety issues regarding uniforms and protective gear but only voiced concern about not receiving them quickly enough, his speech was

not a matter of public concern.  350 F.3d at  416.  The situation in the present case is similar.  Defendants did not refuse to provide protective vests to the corrections officers.  Instead, Defendants agreed to purchase protective vests for the officers, but required officers to wear them if they were procured by the administration (presumably using public funds).  Officers were not forced to abide by this policy either; they were given the additional options to purchase their own vest to wear as each individual officer saw fit, or to wear no vest at all.  Evidently, the great majority of officers chose not to subject themselves to daily inspections or possible disciplinary actions.  Plaintiff's speech about this matter dealt with an individual personnel dispute/grievance.  Any comments he might have made to individual Freeholders would be of no relevance to the public's evaluation of the performance of the MCSD.  Even if he was subject to retaliation for making comments about the vests, his comments did not constitute protected speech giving rise to a cause of action under the First Amendment or the New Jersey Constitution.  This portion of the First and Fourth Counts lacks merit.

 Plaintiff also states in his complaint that he publicly opposed Defendant Rochford's attempts to privatize the jail by speaking publicly against privatization at union meetings, freeholders meetings, and in the local newspapers.  This Court previously held that "a decision to restructure the jail in this fashion would affect a great many people both in and out of the Sheriff's Department.  Staffing, financial considerations, safety of the inmates and the surrounding communities, and the overall effectiveness of such a drastic change is certainly a matter of public concern."  Upon reviewing the uncontested facts, including Plaintiff's own Affidavits, and Plaintiff's counsel's statements made during oral argument, it is clear that the last time the issue of privatization was discussed at a Freeholders meeting was in 1995.  Plaintiff also

claims to have engaged in numerous "discussions" concerning privatization since, the last occurring in 2000, but does not specify when those discussions occurred, with whom he had the conversations, or any other specifics about that discussion.  The only clear fact is that no public discussions have taken place since 1995.  It may well be that this 1995 expression of Plaintiff's views about privatization was so remote in time or otherwise unconnected to the acts which Plaintiff alleges were retaliatory that further discovery will reveal that there was no causative relationship between the speech and the alleged retaliatory acts.  It is premature to rule on that question at this stage of the case, and therefore Defendants' motion for summary judgement on the privatization aspect of the free speech claim will be denied without prejudice.

## *CONCLUSION*

      For all the reasons stated above, Defendants' motion for partial summary judgement dismissing the portions of the First and Fourth Counts relating to stab-resistant protective vests will be granted and the motion for partial summary judgement dismissing the portions of the First and Fourth Counts relating to privatization will be denied without prejudice.


                                        /s/ Dickinson R. Debevoise
                                        Dickinson R. Debevoise, U.S.S.D.J.


Dated: January 5, 2006