**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

HENRY RUIZ,

       Plaintiff,

   v.

MORRIS COUNTY SHERIFF'S DEPARTMENT,
FRANK CORRENTE, EDWARD ROCHFORD,
RALPH McGRANE, and JONH DOES 1 through 10

      Defendants.

Civ. No. 05-1825 (DRD)

**AMENDED OPINION**

Appearances:

PANITCH & RACHINSKY, LLC
By: Richard S. Panitch, Esq.
5 Seney Drive
Bernardsville, New Jersey 07924
    *Attorneys for Plaintiff*

JACOBS ROSENBERG, LLC
By:  Roger B. Jacobs, Esq.
Gateway Four, 3rd Floor
100 Mulberry Street
Newark, New Jersey 07102
    *Attorneys for Defendant Frank Corrente*

CARMAGNOLA & RITARDI, LLC
By: Domenick Carmagnola, Esq.
60 Washington Street
Morristown, New Jersey 07960
    *Attorneys for Defendants Morris County Sheriff's Department and Sheriff Edward
    Rochford*

BARBARULA LAW OFFICES
By:  John M. Barbarula, Esq.
   Thomas Vittolo, Esq.
1242 Route 23 North

Butler, New Jersey 07405
    *Attorney for Defendant Ralph McGrane*


**DEBEVOISE, Senior District Judge**

Plaintiff, Henry Ruiz ("Ruiz"), a correctional officer at the Morris County Correctional

Facility ("MCCF" or "the Jail"), brings this action against his employer, the Morris County

Sheriff's Department ("MCSD"), and Morris County Sheriff Edward Rochford ("Rochford"),

Chief Ralph McGrane ("McGrane"), and MCCF Warden Frank Corrente ("Corrente"

collectively, the "Defendants") pursuant to 42 U.S.C. §1983 and the New Jersey Law Against

Discrimination ("NJLAD"), N.J.S.A. 10:5-1-49.  The Court dismissed portions of Plaintiff's

complaint on November 2, 2005.  The remaining causes of action allege that the Defendants: (1)

deprived Plaintiff of his constitutional right to free speech under the United States Constitution

and Article One, paragraphs 6, 18, and 19 of the New Jersey Constitution; and, (2) violated the

NJLAD.

As explained in the November 2, 2005 opinion, the court has arranged Ruiz's various

constitutional allegations into three categories of potentially protected speech: (1) Ruiz alleges

that he publicly opposed Defendant Rochford's attempts to privatize the jail by speaking out

against privatization at union meetings, freeholders meetings, and in the local newspapers; (2)

Ruiz alleges that the MCSD and its administration attempted to change staffing levels, and that

he publicly opposed this plan at Freeholder meetings; and (3) Plaintiff alleges he publicly

opposed efforts made by Defendants to remove protective vests from approved and compensated

clothing worn by corrections officers.

On January 5, 2006, after Defendants' first motion for summary judgment, the court

2

dismissed the constitutional cause of action as it related to the protective vest issue, leaving only the constitutional claim as it relates to the issues of privatization and staffing.  Defendants now move for summary judgment dismissing the constitutional causes of action altogether, as well as the claim brought under the NJLAD.  For the reasons set forth below, the Defendants' motions will be granted and the complaint will be dismissed.

## FACTS

Ruiz has been employed as a corrections officer at the MCCF since August 9, 1988.  He is the current union delegate for PBA Local 298, the official bargaining unit for corrections officers at the jail, of which he is a past president.  As an outspoken individual who has made himself into something of a public figure, Ruiz has spoken up and engaged zealously in much commendable activity on the behalf of himself and his fellow employees.  So, it is not surprising that Ruiz has found himself embroiled in some acrimonious relationships and considerable controversy.  Ruiz alleges that some of the Jail administrators have violated his constitutional rights by causing a variety of adverse employment actions (the "Adverse Actions") against him specifically in retaliation for his activism regarding the privatization and staffing issues (the "Protected Speech").

In opposition to the motion before the court, Ruiz submits eighteen exhibits which he argues together provide evidence sufficient to entitle him to a trial on the merits.  First, he submits his own signed statement, which is titled "Certification of Plaintiff Henry Ruiz," in which he provides descriptions of a laundry-list of complaints about Adverse Actions he claims were made in retaliation for his Protected Speech.  Ruiz also provides copies of the complaint and the court's previous dispositive opinions in the case.  He also submits a number of letters,

3

affidavits and other documents related to his own claims, as well as to various claims made by other individuals in other actions against the Jail and its administrators. Finally, Ruiz submits the psychological report of Dr. Jakob Steinberg, which is the subject of a separate motion in limine. For purposes of this summary judgment application, the court has considered the report and has found that it goes to damages, and does not substantiate Ruiz's claims.

The record shows that Ruiz has been publically opposed to the privatization of the Jail for about 15 years. His activism has included: being "very vocal" in 1994, including attending Freeholder "work sessions," meeting that year with reporters from the <u>Star Ledger</u> and <u>Daily Record</u>, "recruiting" the state PBA and PBA Correction Officers' Committee, and meeting at restaurants with Freeholder members to discuss their opposition to privatization. From 1995 to 1997, Ruiz submits he was active in publically opposing the privatization of the Jail.

The record shows that most of the Freeholders' discussions concerning the privatization of the MCCF took place in 1995, and the last time this issue was raised at a Freeholders' meeting was in January 1995. During oral argument on an earlier motion, Ruiz and counsel acknowledged that the issue of the MCCF's privatization has not been raised in a public forum since that time. Ruiz now claims (as part of his opposition to the instant motions) to have participated in more recent activism, related not to the privatization of the MCCF, but to the more general issue of privatization of correctional facilities across the country. Among his more recent actions, Ruiz adopted an anti-privatization mission statement in 2001 as Correctional Committee Chairman for the National Association of Police Organizations. He has participated in protest rallies and has lobbied members of Congress on the issue. He also claims to have sought support for his position from various New Jersey governors and the state legislature. He

does not present any evidence that the individual defendants are concerned about this activity, or that they have retaliated against Ruiz for the same.

Regarding the staffing issue, the record shows that Ruiz was publically opposed to various staffing cuts which were proposed in the late 1990s. Specifically, Ruiz attests that he was placed on the Jail's "transition committee" in 1995, but was subsequently removed for being "too vocal" about staffing and safety. Later, he alleges to have "participated in meetings between the Sheriff Administration to discuss staffing at the new jail," and that those meetings occasionally became "heated." On January 28, 1999, Ruiz claims that he "questioned the Jails [sic] Staffing Plan at the Freeholder Meeting" and that "McGrane and the Sheriff were furious about it." Ruiz also says that Chief McGrane "berated" him for "asking a question" at meetings, and that McGrane called Ruiz "an instigator" in front of other staff members. The record shows that the staffing issue has not been raised publically since 1999.

Ruiz also lists, presumably in support of his NJLAD claim, numerous examples of assistance he offered to fellow employees including members of minorities, women and gay corrections officers.

Ruiz alleges that, in retaliation for asserting his opinions regarding the privatization and staffing issues, he was subjected to various Adverse Actions, perpetrated by the Defendants, including denial of promotion, unwarranted disciplining, job suspension, inequitable treatment, verbal taunts, assignment to undesirable work posts and shifts, removal from desirable work posts and shifts, and non-tendering of overtime assignments. He does not offer any specific evidence that any of these actions were retaliatory (vis-a-vis his outspokenness regarding the privatization and staffing issues), though he does offer evidence from other cases in which the

5

Jail administration was sued for similar reasons.  Ruiz argues that reasonable jurors could infer

from the hostility of Jail administrators that the Adverse Actions were taken in retaliation for

Ruiz's Protected Speech.

   Specifically, Ruiz describes a few specific actions which he says were retaliatory, and

then offers a laundry list of more vague, allegedly retaliatory actions.  Ruiz alleges that he was

removed, more than ten years ago, from "the prestigious SERT [Sheriffs Emergency Response

Team] and was not reinstated."  He says that fellow officers told him that his removal was

prompted by his "opposition to the Administration on union issues."  He also claims that he was

removed from the Sheriff's Labor Assistance Program ("SLAP") because of his position on

staffing.  He alleges that he was berated by defendant McGrane, and transferred to less-favorable

posts and hours.  He claims these Adverse Actions were, in part, "punishment" for his stance on

increasing staffing at the Jail.  Ruiz also says that he was denied a "bidded position in the Law

Library by McGrane and Corrente as retaliation for his union activities and speaking out against

the defendants . . .  "  He alleges that in 2000, he was no longer given the extensive time off of

work to attend PBA events (which he had been granted before), and he asserts the reason for the

change was defendant McGrane's anger over the union issues.  Again, Ruiz includes a vague

assertion of his belief that these decisions were prompted by his Protected Speech, but he offers

no other proof.

   Ruiz also complains that the administration failed to promote him and allowed the

"promotion list [to] expire deliberately to bypass Ruiz for a promotion despite the fact that there

was a need for additional sergeants . . ."  He also alleges publication of investigations into his

behavior which he believes was designed to threaten him and union members.  He also alleges

profanity and sexual harassment and an environment in which "it was commonly known that if you spoke up against the administration or in support of the union you would be retaliated against."

On November 10, 2004, following a Freeholder meeting, Ruiz and several other officers spoke with the County Freeholders and informed them that McGrane and Corrente had gone about a course of conduct with the corrections staff that was abusive and violated the law.  On November 29, 2004, Ruiz was charged with falsification of records, lateness, failing to report for roll call, and failing to submit late reports.  He was suspended for three days as a result.  Plaintiff denies the allegations and claims he was unfairly punished.  Plaintiff filed a grievance over these allegations on December 11, 2004.  That grievance was denied by Defendant Corrente on December 16, 2004.  Ruiz alleges that he was suspended in retaliation for his Protected Speech, though he offers no proof of a causal link between the speech which occurred in the 1990s, and the suspension which occurred in 2004.

Defendants deny most of the alleged Adverse Actions, deny that any of the activity was retaliatory, and provide evidence of legitimate motivations for the most serious Adverse Actions alleged by Ruiz to be retaliatory.  Defendants also argue that Ruiz has never, in his career at the Jail, experienced a demotion or pay decrease, and offer evidence of legitimate reasons for the Adverse Actions about which Ruiz complains.

Regarding Ruiz's suspension, the Defendants offer evidence documenting the events leading to Ruiz's suspension, and what appears to be a legitimate business reason for the suspension.   The investigation materials, and photographs, submitted along with Defendants' papers indicate that Ruiz was videotaped coming to work late.  Documentation also shows that

Ruiz claimed to have come into work on time. The inconsistency was treated as a "falsification of time records" for which Ruiz was suspended.

**DISCUSSION**

Although the court is dismayed by the apparent conflicts at the MCCF, and by the alleged behavior of some of its leaders, the court may order relief only to the extent provided by the law. The record paints a picture of acrimony and controversy, but there is no evidence of retaliation which would support Ruiz's claims under § 1983. The remaining New Jersey claims should be decided by New Jersey courts.

I.      Summary Judgment Standard

Summary Judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999), quoting, Anderson, 477 U.S. at 255. But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be

discharged by 'showing' - that is, pointing out to the District court - that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (U.S. 1986).

II.     <u>The Evidence</u>

In opposing the motions for summary judgment, Ruiz submits only a few documents as evidence, including an unsworn "certification" made by Ruiz (the "Certification")[1] setting forth various facts supporting the merits of his claims.  In deciding a motion for summary judgment, the court may consider evidence that would be admissible at trial.  Rule 56(e) of the Federal Rules of Civil Procedure provides that an affidavit "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." <u>See</u> <u>Also</u> L. Civ. R. 7.2(a) (stating that "[a]ffidavits shall be restricted to statements of fact within the personal knowledge of the affiant," and "[a]rgument of the facts and the law shall not be contained in affidavits").  In addition, an affidavit must be executed properly in order to be effective.  <u>Marsellis-Warner Corp. v. Rabens</u>, 51 F.Supp.2d 508, 527 n.20 (D.N.J. 1999).

The Ruiz Certification is signed but not sworn in the form of an affidavit, and the signature page appears to have been added later.  The court will weigh the Ruiz Certification accordingly.

In Addition, the Certification contains many statements which the court finds are little

---

[1]The court has reviewed letters and arguments made by counsel for Defendants in which counsel complains that the opposition papers posted electronically are unsigned, and that the Ruiz Certification was unsigned and made after the close of discovery.  The various documents received by the court were all signed, though Ruiz's Certification is unsworn.

more than bald assertions and self-serving conclusions, which must be disregarded.  See Steele v.

Depuy Orthopaedics, Inc., 295 F.Supp.2d 439, 446 (D.N.J. 2003).  For example, on page 11 of

the Affidavit, Ruiz states that the "[d]efendants undertook a course of conduct toward me . . .

intended to punish me for my lawful exercise of freedom of association . . ."  This is a self-

serving conclusion based upon Ruiz's speculation or beliefs, and does not constitute evidence.

With a few exceptions, in which Ruiz offers at least some explanation for his conclusions, most

of Ruiz's assertions are not based upon his actual personal knowledge.  He also makes statements

about the Jail administrators' alleged reputation for retaliation against outspoken workers,

including his Certification statement that "it was commonly known that if you spoke up against

the administration or in support of the union you would be retaliated against."  Such statements

do not constitute admissible evidence.

     The court will also disregard the many assertions in Ruiz's Certifications which are

merely conclusory and not based upon Ruiz's personal knowledge.

III.   Freedom of Speech

     As stated in the court's Opinion of November 2, 2005, "[a] public employee has a

constitutional right to speak on matters of public concern without fear of retaliation." Baldassare

v. New Jersey, 250 F.3d 188, 194 (3d Cir.2001).  "While the government's role as employer ...

gives it a freer hand in regulating the speech of its employees than it has in regulating the speech

of the public at large, this hand cannot act with impunity." Id.  Therefore, "public employers

cannot silence their employees simply because they disapprove of the content of such speech." Id.

Courts employ a three step analysis when balancing the First Amendment rights of public

employees against competing interests of their employers: (1) plaintiff must establish that the

activity in question was protected (if it is purely personal in nature then it is not, if it is a matter of public concern then it is); (2), if the speech in question is protected, plaintiff must demonstrate that his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees; and (3) if a public employee's speech concerns a matter of public concern, and the balance of harm weighs in favor of the employee's expression, "plaintiff must then show that the protected activity was a substantial or motivating factor in the alleged retaliatory action." Id. at 195. The court found, in an earlier opinion, that the Protected Speech satisfied the first prong, i.e., it concerned matters of public concern. Defendants argue that Ruiz's claims fail to meet steps two and three of this analysis.

If the plaintiff can establish that his/her speech is a matter of public concern, the court proceeds to the second step of the process. Brennan v. Norton, 350 F.3d 399, 413 (3d Cir. 2003). "The plaintiff must then 'demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees.'" Id. at 413 (quoting Baldassare, 250 F.3d at 195). This inquiry is purely legal and is therefore decided by the court as a question of law. Id. Courts must balance the speaker's First Amendment interest against any injury the public employer may suffer as a result of that expression. Id. (citing Baldassare, 250 F.3d at 197). "On the one side, we weigh the public employee's interest in speaking about a matter of public concern and the value to the community of [him/]her being free to speak on such matters." Id. (citing Azzaro, 110 F.3d at 980). "Balanced against these interests is the government's interest as an employer in promoting the efficiency of the services it performs through its employees." Id. "Only if the

11

value of the speech, as measured by the employee's and the public's interests, is outweighed by the government's interest in effective and efficient provision of services, will [a court] hold that the speech is unprotected." Id.

Ruiz has satisfied the second prong of the analysis.  Here, the Defendants have not shown what interest the Jail had (other than avoiding disagreement) in keeping Ruiz quiet about any of the issues about which Ruiz spoke.  Ruiz's advocacy has not been an unreasonable threat to authority, harmony or confidence.  Moreover, the Defendants certainly have not shown why the retaliatory, and sometimes profane and mean acts alleged by Ruiz would further the MCSD's legitimate interest in the administration of the Jail.

This leaves only the third step in the analysis.  If a "public employee's speech concerns a matter of public concern, and the balance of harm weighs in favor of the employee's expression, 'plaintiff must then show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.'" Brennan v. Norton, 350 F.3d at 414 (quoting Baldassare, 250 F.3d at 195).  However, a plaintiff will not necessarily prevail even if he/she is able to clear this last hurdle.  "[T]he public employer can [still] rebut the claim by demonstrating it would have reached the same decision ... even in the absence of the protected conduct."  The question is "whether the record supports a finding that the [plaintiff's] expression caused any of the defendants to retaliate against [the plaintiff] for that expression." Brennan, 350 F.3d at 414.

## A.    Retaliatory Adverse Actions

There is no evidence establishing such a causal link here--either directly or by reasonable inference--between the Protected Speech and the alleged Adverse Actions.  Taken individually,

most of the Adverse Actions were too minimal to be actionable as a First Amendment claim. SeeMcKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006). The question is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights . . ." McKee, 436 F.3d at 170 (citing Suppan v. Dadonna, 203 F.3d 228, 235 [3d Cir.2000]). The effect of the alleged conduct on the employee's freedom of speech "need not be great in order to be actionable" but "it must be more than de minimis." Id. (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir.1982) (Posner, J.)); See also Brennan, 350 F.3d at 422 n. 17 (noting that "incidents of what might otherwise be trivial 'harassment' " may be actionable through their "cumulative impact ... even though the actions would be de minimis if considered in isolation").

Ruiz's various allegations of name-calling, arguments and disputes about workday scheduling seniority, in light of all of the evidence, are not actionable, and a reasonable jury could not find that they would deter a person of ordinary firmness from speaking out. A few of the Adverse Actions may have risen to the level of being "retaliatory" as alleged, but the record does not support even an inference that these Adverse Actions were motivated by Ruiz's exercise of Protected Speech.

**B.  Retaliation Related to the Staffing Issue**

Among the allegations which rise to the level of actionable significance is Ruiz's claim that he was removed from SERT in 1996, and from SLAP in 1999, in retaliation for his public position on the staffing issue; however, the record does not contain any evidence that the Adverse Action was in retaliation for Ruiz's Protected Speech. An adverse action in close proximity to

13

protected speech may warrant an inference of retaliatory motive, but temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision.  Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2005) (citing McGuire v. City of Springfield, 280 F.3d 794, 796 (7th Cir.2002)).  Evidence of causation may include evidence the employer expressed opposition to the employee's speech, see Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 929 (9th Cir. 2004), or evidence the speech implicated the employer in serious misconduct or wrongdoing.  Baca v. Sklar, 398 F.3d 1210, 1221 (10th Cir.2005).  Indeed, the alleged removal from SERT occurred soon after some of Ruiz's exercise of Protected Speech, but Ruiz does not provide any additional evidence that he was removed from SERT as the result of his Protected Speech.  Instead, he explains that he believes the individual defendants were angry with him at the time he was removed from SERT.  He also claims that a coworker told him that he was removed from SERT as a result, not of the Protected Speech in particular, but more vaguely because of his "union activities."  The coworker's speculation, contained in Ruiz's own certification (rather than in one which the coworker might have provided), about a tenuous connection between the Adverse Action and the Protected Speech, is not evidence sufficient to survive summary judgment.

Moreover, any claim based upon Ruiz's 1996 removal from SERT, 1999 removal from SLAP, and the other allegations of retaliation occurring more than two years before the filing of the complaint, appear to be time-barred.  O'Connor v. City of Newark, 440 F.3d 125, 126-7 (3d Cir. 2006) (applying New Jersey's two-year statute of limitations period to § 1983 actions, and adopting a bright-line rule that "discrete acts, which are individually actionable" may not be aggregated for statute of limitations purposes, and "must be raised within the applicable

14

limitations period or they will not support a lawsuit" (quoting National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002))).

### C.    Retaliation Related to the Privatization Issue

Ruiz also alleges a more recent Adverse Action involving his three day suspension which, as alleged, rises to the level of actionable retaliation.  Ruiz claims that he was falsely charged with a variety of violations of the Jail's rules, and was suspended for three days in retaliation for his speech regarding the privatization issue; however, the record does not support that this Adverse Action was retaliation for any of Ruiz's Protected Speech.

Foremost, Ruiz's self-serving conclusory allegations contained in his Certification do not constitute evidence by which reasonable jurors could infer that Ruiz was suspended in retaliation for his opposition to privatization.  Moreover, the record suggests that all of the individual defendants maintained opinions which comported with Ruiz's own opposition to the privatization of the Jail, seriously undermining Ruiz's claim that his suspension was in any way related to his stance on privatization.  See Alpha Energy, 381 F.3d at 929.  Among the evidence before the court, Rochford proffers a friendly letter that he handwrote to Ruiz in 1998 in which he assured Ruiz that he had no interest in privatizing the Jail, and that concerns about the same were unfounded.  In a sworn deposition, Ruiz explained that he believed Corrente, like Ruiz, was opposed to the privatization of the Jail.  He also explained that he had no evidence that Corrente was involved in the dispute about privatization, or that Corrente had retaliated against Ruiz regarding the same.  And, all of the individual defendants, assuming rational self-interested motivation, had every reason, like Ruiz, to oppose any effort to privatize the Jail.

15

Further weakening Ruiz's claims, a significant period of time elapsed between Ruiz's suspension and Ruiz's last public statements on the issue of the privatization of the MCCF.  As the court explained in the January 2, 2006 Opinion and Order disposing of the first motion for summary judgment:

> The only clear fact is that no public discussions have taken place since 1995. It may well be that this 1995 expression of Plaintiff's views about privatization was so remote in time or otherwise unconnected to the acts which Plaintiff alleges were retaliatory that further discovery will reveal that there was no causative relationship between the speech and the alleged retaliatory acts. It is premature to rule on that question at this stage of the case, and therefore Defendants' motion for summary judgement on the privatization aspect of the free speech claim will be denied without prejudice.

Ruiz v. Morris County Sheriff's Dept., 2006 WL 42086, at *6 (D.N.J. 2006).  It appears that the extensive discovery in which the parties have engaged since the court's January 2, 2006 Opinion has not provided Ruiz with any additional support for this claim.

The considerable length of the intervening period between the Protected Speech and the alleged Adverse Actions negates any reasonable inference that Defendants' Adverse Actions can be characterized, without additional support, as retaliation against Ruiz's Protected Speech.   An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment.  Ramirez v. Oklahoma Dept. of Mental Health, 41 F.3d 584, 596 (10th Cir.1994).   On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, see McGuire v. City of Springfield, 280 F.3d 794, 796 (7th Cir.2002), or evidence of intervening events, see Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir.1998), tend to undermine any inference of retaliatory motive and weaken the causal link.  And the court need

16

not sustain claims built upon all inferences, but only reasonable ones.  Maestas, 416 F.3d at 1189.

Ruiz also alleges that he engaged in Protected Speech more recently, including his adoption of an anti-privatization mission statement in 2001 as Correctional Committee Chairman for the National Association of Police Organizations.  He also claims to have sought support for his position from various New Jersey governors and the state legislature.

This recent speech, although related generally to the privatization of correctional institutions, does not concern the specific issue of the privatization of the MCCF–the issue upon which Ruiz has based his claims.  Indeed, Ruiz's newly alleged, recent speech does not seem to be linked at all to the Defendants, and no reasonable inference can be drawn, based upon the evidence now before the court, that the alleged Adverse Actions were made in retaliation for the most recent Protected Speech.  There is no evidence that the Defendants either know or care about Ruiz's apparently national efforts to oppose privatization of correctional facilities.  Thus, the most recent Protected Speech occurred more than five years before the suspension, and there can be no inference of causation in this case based upon any "close temporal proximity between the speech and challenged action."  Harvey v. Baker  242 Fed.Appx. 547, 553, 2007 WL 2153226, at *4 (10th Cir. 2007).

As additional evidence, Ruiz submits the sworn affidavit of Robert Freid, who describes a meeting he attended together with Ruiz and defendants McGrane and Corrente.  According to Freid, McGrane and Corrente were angry with Ruiz and Freid for their activities related to the protective vest issue (which the court has already disposed of in this case).  Fried says that

McGrane said to him "Henry is dead," and "Corrente then remarked that anything that can be done to make his (Ruiz's) life 'miserable' will be done."  These allegations are acrimonious indeed, but the statements clearly were made in reference to the protective vest issue, and not the staffing and privatization issues.  Thus, Fried's affidavit provides no support to Ruiz's belief that the Adverse Actions were made in retaliation for his exercise of Protected Speech.

### D.    Pattern of Retaliation

The court also considers whether the alleged Adverse Actions, taken cumulatively, establish a retaliatory pattern.  See Brennan, 350 F.3d at 422 n. 17.  There is no evidence by which a reasonable jury could infer any nexus between the allegedly retaliatory pattern of Adverse Actions and Ruiz's Protected Speech.   The evidence may permit a reasonable inference of general dislike and relationships characterized by acrimony and a related pattern of arguments and petty insults, but not of the necessary causal link between the alleged Adverse Actions and Ruiz's exercise of Protected Speech.

The Fried Affidavit, together with the evidence submitted which was originally prepared for use by plaintiffs in other actions, including the affidavit and certification of James O'Brien, the affidavit of Ronald Flammer, and the excerpt of Lisa Knowlton's separate civil complaint, certainly permit an inference that many of the corrections officers were unhappy with the Jail's administration, and may permit an inference of a pattern of ugly conduct on the part of the administration, but not an inference of a pattern of retaliation.  O'Brien alleges that several of the Jail's administrators discriminated against him on the basis of his race.  Knowlton alleges that the administration discriminated against her on the basis of her gender, among other things, and

that the MCCF has been a hostile work environment.  Flammer alleges that McGrane and

Corrente retaliated against him for his union activities, including his support of various officers

in asserting their rights to be represented by the PBA.  In addition, Flammer claims to have been

threatened and punished for his "perceived alliance with Lisa Knowlton."  Flammer alleges that

he has weathered extensive abuse and retaliation since becoming an outspoken leader in the

PBA.  These submissions corroborate Ruiz's concerns about the administration generally–an

alleged pattern of very ugly misdeeds–and, if true, may substantiate other types of claims against

the administration, but these submissions do nothing to bolster Ruiz's allegations of a pattern of

retaliation related to his Protected Speech regarding the privatization and staffing issues.

The evidence shows only a chronology of events consistent with an acrimonious

employment relationship, and there is no evidence that the allegedly retaliatory Adverse Actions

were connected to Ruiz's activities related to privatization or staffing.

### E.     Legitimate Reasons for Adverse Activity

In any event, even if the court were to hold that Ruiz has established a causal connection

between the Protected Speech and the Adverse Activity, the summary judgment motion would

prevail nonetheless because Defendants submit substantial evidence of legitimate, non-

discriminatory reasons for the alleged Adverse Actions.  To defeat a motion for summary

judgment, a plaintiff must point "to some evidence, direct or circumstantial, from which a

factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action."  Griesbaum v. Aventis Pharmaceuticals, 2007 WL

4480624, at *6 (3d Cir. 2007) (citing Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000).  Here, Ruiz has done neither.  He offers no evidence to discredit the Defendants' assertions nor to show that retaliation was a substantial motivating factor in the Adverse Actions.  The Defendants' evidence of well-documented, legitimate, non-discriminatory reasons for the Adverse Actions has been met with no counter-evidence by which a jury could discredit the legitimacy of the Defendants' motives.

IV.    NJLAD

In his Complaint, Ruiz alleges he is entitled to an award under NJLAD.  Under the circumstances, the court must determine whether to extend supplemental jurisdiction to this remaining claim.

Congress has vested in district court judges the discretion to determine whether to exercise supplemental jurisdiction[2].  De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003).  At least one of the acceptable reasons for not extending jurisdiction–"the district court has dismissed all claims over which it has original jurisdiction"–applies here.  In light of the particular interest the state has in shaping and interpreting its own law against discrimination, the court elects to exercise its discretion to not extend supplemental jurisdiction to the remaining state-law claim.

---

[2] Under 28 U.S.C. § 1367(c), District courts may decline to exercise supplemental jurisdiction where:
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

## <u>CONCLUSION</u>

For all the reasons stated above, Defendants' motions for summary judgment will be

GRANTED and the complaint will be DISMISSED[3].

_____
_____
_____Dickinson R. Debevoise, U.S.S.D.J.

Dated: May 28, 2008

---

[3]The summary judgment renders moot the Defendants' pending motion to exclude the psychological report of Dr. Jakob Steinberg.